**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X
In re: DAVID KLEIMAN, Debtor

                                              Chapter 7
                                              Case No. 05-37809 (RG)

- - - - - - - - - - - - - - - - - - - - - - - - - -X
KEVIN GOODMAN, Plaintiff

      v.

                                              Adv. No. 05-06158 (RTL)

DAVID KLEIMAN, Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

MAURICE & NEEDLEMAN, P.C.
Donald S. Maurice, Esq.
Attorney for the Plaintiff

DAVID KLEIMAN
Defendant *Pro Se*

**RAYMOND T. LYONS, U.S.B.J.**

Plaintiff, Kevin Goodman, ("the Plaintiff") seeks a judgment against Defendant, David Kleiman, ("the Debtor") finding the amount of $38,771.32 nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The Plaintiff alleges that the Debtor made several misrepresentations regarding his financial condition and fraudulently induced the Plaintiff to loan him $35,000. After trial, the court determines that the Debtor, with intent to deceive the Plaintiff, falsely represented in writing that he had a vested right to a bonus of $100,000 and that the Plaintiff

1

actually and reasonably relied thereon to his detriment.  The debt to the Plaintiff is nondischargeable under 11 U.S.C. § 523(a)(2)(B).

## JURISDICTION

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court.  This is a core proceeding within the meaning of 28 U.S.C. §  157(b)(2)(I) (dischargeability of particular debts).

## FINDINGS OF FACT

In 2003, the Debtor was employed as a Managing Director of Pan-European Sales for a well known securities broker on Wall Street.  The Debtor had started work at that particular firm in April 2003, but had been continuously employed at other Wall Street firms for eight years.  In the prior several years, the Debtor's earnings had been very high – in one year he earned $750,000.  He was single, never married and had no dependants, yet, the Debtor had no savings or other assets.  The evidence did not fully explain this anomaly except for two reasons mentioned in passing (satisfying his student loans and assisting with a relative's medical expenses) and a third reason – excessive spending at nightclubs that he charged on a credit card embossed with his employer's corporate name.  As he began to experience problems paying his credit card bills, the Debtor approached his friend seeking a loan of $30,000.  The friend declined to make the loan, but instead explained the Debtor's situation to a mutual friend, the Plaintiff, in a phone call on August 27, 2003.  The Debtor was present on the phone call.  The Plaintiff claims that the friend made several representations during the phone call:

(1) that the Debtor was presently working for the brokerage firm;

(2) that the Debtor's base salary was $150,000 *per annum*;

(3) that the Debtor was presently entitled to a bonus of no less than $100,000, payable sometime before January 31, 2004, without contingency;

(4) that the Debtor's present cash needs of $30,000 would be sufficient to pay off any and all delinquencies;

The Debtor and the Plaintiff had known each other for over twenty years following college and had socialized in the past. Recently, they had not been in direct contact but were generally kept apprised of the other's situation though their mutual friend. The Plaintiff understood that the Debtor had a successful career on Wall Street. The Debtor understood that the Plaintiff was a lawyer who had some connection with a family collection business and would make loans to individuals and businesses, such as restaurants, from time to time. The Plaintiff testified that he was Assistant General Counsel and Vice-President of a corporation. No other evidence suggests he was in the lending business. The Plaintiff said he might be able to make a loan to help a friend but wanted to be sure he would be repaid.

Soon after the phone call, the Debtor sent the Plaintiff several emails confirming these representations.[1]

> ...the positive side of my situation is that my living expense obligations and other debt are minimal. I have no crushing mortgage (I rent), child expenses...I have approx. $5,000 in other credit card debt which I am making monthly minimums on until year end...I make $150,000 in base comp and my NIGHTMARE SCENARIO would be $100,000 in bonus. I have NEVER been

---

[1] The Debtor raised the amount requested from $30,000 to $35,000 in an email to the Plaintiff on August 27, 2003.

>
> unemployed since college and have weathered the biggest
> downturn this industry has seen in a quarter century...BUT...I do
> have a temporary cashflow problem...

Email from the Debtor to the Plaintiff dated August 28, 2003, 9:24 AM.

> The bonus is vested in the sense that there is no restriction on it.
> The amount will be determined in mid December and is cash.
> Only amounts in excess of $250,000 merit a portion (up to 1/3) of
> the bonus to be paid in non-cash...stock which in turn "vests" 1/3
> per annum...For instance, in my worst case $100,000 scenario a
> cash payment would be made to me a few weeks after the exact
> amount was determined.

Email from the Debtor to the Plaintiff dated August 28, 2003, 10:53 AM.

The Debtor also recounted that his annual bonus in past 5 years had averaged over $100,000. However, the Debtor told the Plaintiff he could not borrow from a bank because he had a poor credit history and he had no assets to pledge as collateral. When asked whether he had other debts, judgments or tax obligations, the Debtor said no. The $35,000 would allow him to pay off his credit cards and he had no other debts. There is conflicting testimony about loans due to family members. The Debtor says he told the Plaintiff he had recently borrowed from a relative and could not ask again. The Plaintiff recalls being told that the Defendant had not, and could not, borrow from family. Plaintiff learned that the Debtor had in fact, borrowed from a family member because his bankruptcy schedules revealed a pre-existing family debt. The schedules also revealed a six-figure tax debt to the IRS for 2002 income taxes. As of August 2003, when the loan was discussed, the Debtor had not yet filed his 2002 tax return, but he knew he had received a large bonus in stock that year and his tax preparer had advised him he faced a large tax obligation.

The Plaintiff testified that he asked the Debtor whether he would be entitled to his bonus

4

even if he was fired. According to the Plaintiff, the Debtor said he would. The Plaintiff further testified that he understood the word "vested" in the email to mean just that; i.e., that the bonus had been earned and was legally due the Debtor even if he was not employed at the brokerage firm at the end of the year. Unless the bonus was vested, the Plaintiff would not have made the loan.

The Debtor testified differently. He denied saying that he would be entitled to his bonus even if he was not employed at the brokerage firm. When he used the term "vested" he meant that once the bonus was announced, he would be paid in cash soon thereafter. However, his bonus was discretionary, not guaranteed.

The Plaintiff asked if he could speak to the Debtor's supervisor to verify the information about the bonus. The Debtor said he would be uncomfortable with that. After all, the reason he needed the loan was that he could not pay his credit card that was embossed with his employer's logo. It would be embarrassing for him, being employed in the financial business, to have his predicament disclosed.

On September 4, 2003, the Debtor signed a promissory note for the Plaintiff in the amount of $35,000 plus interest at the rate of ten percent (10%) *per annum.* The Plaintiff wired the Debtor the requested funds on the next day. In late September of 2003, the Debtor was terminated from his employment at the brokerage firm and failed to receive his annual bonus. The Debtor defaulted on his loan. Between September 4, 2003 and August 30, 2005, the Debtor paid $3,200 in interest to the Plaintiff, leaving an unpaid balance of $38,771.32.

The Debtor filed for chapter 7 on August 30, 2005 and received a discharge on December 9, 2005. On November 21, 2005, the Plaintiff initiated this adversary proceeding seeking to

declare his claim against Debtor nondischargeable on the grounds of fraudulent misrepresentation under 11 U.S.C. § 523(a)(2)(A).

## DISCUSSION

"The overriding purpose of the Bankruptcy Code 'is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start.'" *Starr v. Reynolds (In re Reynolds)*, 193 B.R. 195, 200 (D.N.J. 1996) (quoting *Insurance Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113 (3d Cir. 1995)). Accordingly, exceptions to discharge are to be narrowly construed. The Plaintiff has the burden of proving each element of the objection by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991), *Starr v. Reynolds (In re Reynolds)*, 197 B.R. 204, 205 (Bankr. D.N.J. 1996).

A countervailing policy is that debts incurred through fraud should not be discharged. The discharge is reserved for the honest but unfortunate debtor. *Grogan v. Garner* at 286-287. "Where a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors." *Cohen v. De La Cruz (In re Cohen)*, 106 F.3d 52, 59 (3d Cir. 1997), *aff'd* 523 U.S. 213 (1998).

Although the Plaintiff has sought relief solely under Section 523(a)(2)(A), the court questioned whether Section 523(a)(2)(B) might be more appropriate in these circumstances. Section 523(a)(2) provides:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt.

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by –
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's

6

>        financial condition:
>            (B) use of a statement in writing –
>                (i) that is materially false;
>                (ii) respecting the debtor's or an insider's
>                    financial condition;
>                (iii) on which the creditor to whom the debtor is
>                    liable for such money, property, services, or
>            credit reasonably relied; and
>                (iv) that the debtor caused to be made or published
>                    with intent to deceive; or . . .

Subsection A excludes "a statement respecting the debtor's . . . financial condition." Subsection B deals with allegedly false statements respecting the debtor's financial condition. The two subsections are mutually exclusive and require different elements of proof. *Land Inv. Club,Inc. V. Lauer (In re Lauer),* 371 F.3d 406, 413 (8th Cir. 2004). The principal differences are that statements concerning a debtor's financial condition must be in writing and the creditor's reliance must be reasonable, not merely justifiable. *Field v. Mans,* 516 U.S. 59 (1995), *Nicolson v. Nicolai (In re Nicolai)*, 2007 Bankr. LEXIS 339 (Bankr. D.N.J. January 31, 2007).

To determine which subsection of 523(a)(2) is applicable the court must decide whether the allegedly false statements were respecting the debtor's financial condition. In a post trial brief, Plaintiff notes a split of authority and urges the court to adopt the narrow view that only a statement akin to a formal financial statement completely describing a debtor's assets, liabilities, income and expenses comes within subsection B. *See, Schneiderman v. Bogdanovich (In re Bogdanovich),* 292 F.3d 104, 112-113 (2d Cir. 2002) (collecting cases adopting broad view or narrow view). A decision by the district court in New Jersey is cited as the seminal case for the narrow view. *D. Nagin Mfg. Co. v. Pollina (In re Pollina)*, 31 B.R. 975 (D.N.J. 1983). The Plaintiff argues that the Debtor's statements regarding his bonus and liabilities do not meet this narrow standard and should be judged under subsection A. This court agrees with the approach

in *Nicolai* that the type of information and its purpose determine whether a statement is respecting a debtor's financial condition. 2007 Bankr. LEXIS 339 *3. Here the email messages about the bonus were accompanied by other information, both oral and in writing, concerning the Debtor's substantial income, work history, low expenses and lack of other liabilities but no collateral and a poor credit history. Clearly this is the type of information a lender would seek when considering a loan request. Furthermore, the statements were made to induce Plaintiff to make a loan. The court concludes that the Debtor's statements in this case were respecting his financial condition, therefore the Plaintiff must prove all the elements of subsection 523(a)(2)(B) to receive a determination of nondischargeability.[2] The elements are:

>    (1) the debtor made a written statement
>    (2) concerning his financial condition
>    (3) that was materially false
>    (4) intending to deceive the creditor; and
>    (5) the creditor actually and reasonably relied on the misrepresentation.

There are five representations that Plaintiff claims were false. First is the written statement in the email that the Debtor's bonus was "vested". Second were the written statements that in the worst case, nightmare scenario the bonus would be no less than $100,000. Third was the alleged, disputed oral statement that Plaintiff would have the right to his bonus even if he was fired before the end of the year. Fourth was the oral representation (disputed) that the Debtor had not borrowed from relatives and fifth was the oral representation (disputed) that the

---

[2] Even though the complaint cites only subsection 523(a)(2)(A) and the Plaintiff's post trial brief asserts that subsection A is the proper statutory provision, the court will determine whether the evidence warrants nondischargeability under subsection B. The Debtor is not prejudiced. His defense of his statements as being true is the same under either subsection A or B and he need defend only written statements under subsection B. The Plaintiff's burden to prove reasonable reliance is somewhat higher under subsection B, so the Debtor is not prejudiced in that regard either.

Debtor had no tax obligations. The later three statements will not be considered because they were not in writing.

As to the term "vested", the Debtor argues that he used the term to mean that once the bonus was declared, he would not have to wait or perform any more services to be legally entitled to payment. But since he lost his job before the bonus was declared, he did not have the right to it. He would distinguish a "guaranteed" bonus as one he would be entitled to even if no longer employed at the end of the year. In fact, the Debtor testified that he once had a guaranteed bonus, but that was unusual. Debtor also testified that when he used the term vested he meant to convey that the bonus would be paid in cash, not in restricted stock. At a previous job, the Debtor had received a bonus in stock and this resulted in a large tax obligation that he has not yet satisfied. The Plaintiff, on the other hand, claims that he understood "vested" to mean that the Debtor had the right to a bonus no matter what.

To warrant nondischargeability, a representation must not only be false, but the Debtor must have known it to be false. The Debtor's subjective intent is crucial. Nevertheless, terms must be given their ordinary meaning and a debtor must expect the listener to understand his words according to their ordinary meaning. *Armco, Inc. v. Glenfed Financial Corp.,* 746 F.Supp. 1249, 1263 (D.N.J. 1990). *Webster's* defines "vested" as "fully and unconditionally guaranteed as a legal right, benefit or privilege." *Merriam-Webster's Collegiate Dictionary,* Tenth Edition (1999). In the context of the Debtor's email stating that his bonus was vested, the ordinary meaning would be that he had a fixed, absolute right to his bonus. As it turns out, that statement was false. The Debtor's attempt to distinguish a guaranteed bonus from a vested bonus is not persuasive. To the ordinary listener, the terms would be equivalent. The Plaintiff has proven

9

that the Debtor's statement that his bonus was vested was materially false.

However, it is clear that the amount of the bonus was not fixed and apparently discretionary on the employer's part. The Debtor's statement that $100,000 is his nightmare scenario indicated that he could not determine the amount of his bonus, but had a firm expectation that it would be no less than $100,000 based on his past history of employment on Wall Street. Does this uncertainty as to amount suggest that Plaintiff was not justified in relying on the Debtor's representation that his bonus was vested? No. Plaintiff was concerned about a source of repayment for his $35,000 loan. The Debtor identified his bonus as the source. Plaintiff sought assurance that the bonus would be paid and received the Debtor's representation that the bonus was vested and would be no less than $100,000.

Discovery from the employer revealed that the company had actually budgeted a $200,000 bonus for the Debtor. Had he not been fired, he would have, most likely, been paid that amount. The Debtor's use of the term worst case or nightmare scenario related to the amount of the bonus, not the right to receive it. Those statements were true. That uncertainty as to amount does not change the fact that the Debtor represented that his bonus was vested, which was false.

The Debtor argues that since the Plaintiff is a lawyer he should have know that Wall Street bonuses are discretionary unless provided for in a written contract. The Plaintiff did not insist on seeing a written contract, so he must have known that the bonus was discretionary – so says the Debtor. This argument is not persuasive. While it may be the practice on Wall Street to commit certain employment contracts to writing, there is no evidence that the Plaintiff was aware of this practice, even though he is an attorney. Furthermore, the Plaintiff requested permission to

speak with the Debtor's supervisor, which the Debtor declined. The Debtor was desperate for the money so that his employer would not learn of his irresponsibility with respect to his personal finances. His refusal to permit the Plaintiff to contact his employer leads to the conclusion that he knew his representation that the bonus was vested was false and that he made it with the intent to deceive the Plaintiff.

*Reasonable vs. Justifiable Reliance.*

The Plaintiff's reliance need be more than merely justified – a lower standard. The Plaintiff would be justified in relying on a representation that was not patently false. *Field v. Mans,* 516 U.S. 59, 70 (1995). Section 523(a)(2)(B) requires a creditor's *reasonable reliance* on the misrepresentations of a debtor; a more stringent standard than the showing of justifiable reliance as required by § 523(a)(2)(A). *Insurance Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3d Cir. 1995). Evidence that demonstrates that a loan would not have been granted if the creditor had received accurate financial information is sufficient to show reliance. *National Union Fire Ins. Co. v. Main (In re Main)*, 133 B.R. 746, 751 (Bankr. W.D. Pa. 1991).

> The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances
>
> A determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust,

> or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Insurance Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3d Cir. 1995)

> "Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) 'cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith.'" *Woolum,* 979 F.2d 71 at 76 (quoting *In re Martin,* 761 F.2d 1163, 1166 (6th Cir. 1985)). Reasonableness is therefore "a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith."

*National Union Fire Ins. Co. of Pittsburgh, Pa., v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 305 (2d Cir. 1996).

In this case, this was a loan by one friend to help another. Although the Debtor said he had heard that the Plaintiff had made other loans, this was not corroborated. Also, the Debtor claimed that the Plaintiff was involved in a family collection business, that was not substantiated. The Plaintiff is a lawyer working for a corporation. Although he is educated and sophisticated, he is not in the business of lending money. This transaction was more in the nature of an accommodation for a friend who came in desperation. The Plaintiff made all conceivable inquiries about collateral, income, expenses, assets and liabilities. He was willing to help a friend but did not want risk. He was told there was no other collateral, but was assured he would be repaid when the Debtor received his bonus in a few weeks. His attempt to verify the bonus was rebuffed by the Debtor. In this context of a loan between friends there is no need for proof of the creditor's standard practice or industry customs. There was no "red flag" that would alert an ordinary person to the falsity of the Debtor's description of his bonus as vested. The

Plaintiff's reliance was reasonable.

The Debtor claims that the loan bore a high rate of interest indicating the Plaintiff considered it to be high risk and that Plaintiff made the loan to earn a high return on his money. The Debtor bases this assertion on his understanding that he had to repay the principal plus 10% interest in less than three months. By his calculation, the annual percentage rate would be 40%. He is clearly wrong. The promissory note states that the principal is due on demand with interest at 10% per annum from the date of the note. If the Debtor had paid the note at the end of 2003, the annual interest would have been prorated. The rate of interest was relatively modest. Rather than the implication suggested by the Debtor, the modest rates support the conclusion that this was an accommodation, not a business venture by the Plaintiff.

## CONCLUSION

The Debtor falsely represented that he was entitled to a bonus that was vested. He did so intending to deceive the Plaintiff and induce him to make a loan of $35,000. If the Plaintiff knew the truth, he would not have made the loan. His reliance was reasonable. Plaintiff shall have a judgment determining the Debtor's debt to him nondischargeable under 11 U.S.C. § 523(a)(2)(B).

May 18, 2007                                              __/S/ **Raymond T. Lyons**____
                                                          United States Bankruptcy Judge